THOMAS HENDERSON AND OTHERS v. THOMAS J. PILGRIM AND OTHERS.

The assignees of a mortgage upon land, acquire by such assignment, no rights which they can enforce against the land in the hands of *bonâ fide* purchasers, for a valuable consideration, without notice.

A purchaser, who, after using proper diligence to inform himself of all the facts, has dealt in good faith with a mortgagee, without notice of a previous assignment, is entitled to protection.

It is the duty of the assignee of a mortgage upon land, to make his assignment a matter of record; and if he fail to do so, he should suffer, rather than the subsequent purchaser, who is deceived by appearances, and who has no notice or record to guide him.

An assignment of a mortgage upon land, is such an instrument, within the meaning of our registry laws, as ought to be recorded, to make it effectual against subsequent purchasers, for a valuable consideration, without notice.

The record of a mortgage, made to secure the payment of a note, payable to the mortgagee, or order, does not operate in favor of the assignee of the note and mortgage, against a subsequent purchaser, for a valuable consideration, from the mortgagor and mortgagee.

Where a party, not connected with the business, stated to the purchaser that there was a mortgage on the land, and that he had heard that the claim was held by some one in New Orleans, this would not operate as notice of the assignment of the mortgage; especially when, from the information given to the purchaser, he may as readily have supposed, that reference was had to a previous claim to the mortgage, which had been settled, as to the plaintiff's assignment.

If the purchaser has paid the whole purchase money, by the payment of judgment debts of the vendor, in such manner that the judgment creditors are satisfied, and the vendor released from responsibility, he is just as much a purchaser for value, as though he had paid the purchase money in cash.

The right of the assignee, under the assignment, is not a naked legal right, upon which he can insist to the overthrow of equities in others. It is only because equity treats the mortgage as a security, and as incidental to the debt, that the assignment of the debt carries with it the mortgage, as a continuing lien upon the land.

And where the assignee permitted more than a year to elapse, during which he left it in the power of the mortgagee to practice a fraud upon others, he cannot invoke the aid of a court of equity, for relief against purchasers without knowledge of the assignment, who have paid a valuable consideration.

APPEAL from Gonzales. Tried below before the Hon. Fielding Jones.

The note for ten thousand dollars, deposited with the appellants, was payable to William Means, or order. The other facts are stated in the opinion.

*Mills* and *Batchelor*, for appellants. 1st. We say that Wm. Means did not, in fact, release the mortgage of the 14th April, 1856; his relinquishment applies, in language and in fact, to the deed of trust, because his release says, the "deed of trust" of the 14th April, 1856. This is important, because there was a deed of trust and mortgage, on the same land, of the same date. Chenault's evidence of what Wm. Means meant, can have but little weight, in a case like this, it being one of peculiar features. Again, to infer that his release was intended to apply to the mortgage, will be *presuming* that Wm. Means intended a fraud upon the plaintiffs, the holders of the mortgage and note, which the law will not suppose.

2d. The mortgage and note being outstanding in the plaintiffs, can the mortgagee, Wm. Means, affect it, in any way, by his release to F. B. Means? If the mortgagee has transferred the note, he cannot afterwards convey the land. A deed from the mortgagee is not enough; it must appear that *the debt* passed to the grantee, or that he had *a right to transfer the debt;* his deed, as to the debt and mortgage, passed nothing. (Bell v. Morse, 6 N. H. Rep. 205; Dick v. Mawry, 9 Sm. & Marsh. Rep. 448; Parker v. Kelly, 10 Id. 184.)

The assignment of the mortgage, so far divests the title of the
30

mortgagee, that he has no power to discharge the mortgage, or any part of it. (McCormick v. Digby, 8 Blackf. Rep. 99.)

The lien lasts as long as the debt; nothing but payment, or release by one who controls the debt, will discharge it. (Morse v. Clayton, 13 Sm. & Marsh. Rep. 373.)

No man can release or transfer a right which he has not. (4 Greenleaf's Cruise's Dig. 114.)

Wm. Means's release, if applied to the mortgage, was a fraud; and if this be shown, plaintiff's claim is good against the appellees. (Trenton Banking Co. v. Woodruff, 1 Green's Ch. Rep. 117.)

The appellees claim to be purchasers without notice. To this, we answer, the mortgage and note were on record in the proper county; of this, they had notice; and also, that the note was negotiable, and due 14th April, 1857. They cannot be such, in this case; there was no *merger* of the legal and equitable estates, in any of the vendors, at the time of the purchase, and in the *same* right.

F. B. Means mortgaged to Wm. Means, on the 14th April, 1856. The latter assigned the note and mortgage to the plaintiffs, on the 26th March, 1857. Afterwards, on the 31st March, 1858, Wm. Means released to F. B. Means. On the 1st April, 1858, Wm. and F. B. Means conveyed to the appellees, Pilgrim and Stewart, with warranty. Where is the merger? There can be no merger, unless the two estates (the mortgage and fee,) unite in one and the same person, and in the same right.

Upon the assignment to the plaintiffs, they became mortgagees, and F. B. Means mortgagor; and Wm. Means had no estate, of any kind, in the land. When Wm. Means released to F. B. Means, it passed nothing as to the mortgage; under the authorities above cited, the plaintiffs still holding the rights of the mortgagee. Wm. Means's deed to Pilgrim and Stewart passed nothing, for he had divested himself of all title, by the assignment; the deed of F. B. Means passed only his interest, as mortgagor, to Pilgrim and Stewart. As the assignment, by the mortgagee, to the plaintiffs, was prior to the release of the

mortgagee, Wm. Means, to the mortgagor, the estates or interests of the mortgagee and mortgagor, never became united in the mortgagor, F. B. Means; and not subsisting at any time in him, could never unite and merge in the fee. (Pratt v. Bank of Bennington, 10 Verm. Rep. 293; Hunt v. Hunt, 14 Pick. Rep. 374; Forbes v. Moffatt, 18 Ves. Rep. 384.)

The cases of James v. Johnson, (overruled in James v. Morey, 2 Cowen,) 6 Johns. Ch. Rep. 419; Starr v. Ellis, Id. 393; and Mills v. Comstock, 5 Id. 214, on which the appellees rely, show, in each of them, that the merger of the two estates was complete, long *before* the assignment was made by the mortgagee; in this case, the assignment was before the pretended merger.

3d. Again, the interest of the mortgagee was, that he held the land as *security* for his debt; a *chose in action*, transferable and assignable by indorsement of the debt; and any prior transfer, as in this case, would bind any subsequent transfer, or release of the same to third persons. Priority of right *must* give preference. (Muir v. Schneck, 3 Hill's Rep. 228; Taylor v. Bates, 5 Cow. Rep. 376; Bradley v. Root, 5 Paige's Rep. 632.)

The release to F. B. Means, (which we deny applies to the mortgage, but to the trust,) and the conveyance of Wm. Means to appellees, are all subject and subordinate to the rights of the plaintiffs under the first assignment. (Van Rensselaer v. Stafford, Hopkins's Ch. Rep. 569; Stafford v. Van Rensselaer, 9 Cow. Rep. 316; Poillon v. Martin, 1 Sandf. Ch. Rep. 569; Peabody v. Fenton, 3 Barb. Ch. Rep. 451.)

The above New York decisions must have increased weight, since this court, in Dunlap v. Wright, 11 Tex. Rep. 597, said the decisions of that State have increased authority here, because, in that State the mortgage is regarded as but a mere security for the debt.

4th. Our law nowhere *requires* the assignment of the mortgage and note to be recorded. The cases contemplated by Hart. Dig. Art. 2767, are, where the statute first *requires* them to be

recorded : if so required, then they must be recorded, to take effect as to third persons. It is a general principle, that no instrument gains any validity by being recorded, unless the law first requires it to be.

The Article in question, (Hart. Dig. Art. 2767) manifestly applies to original, primary titles, contradistinguished from derivative titles at common law. (2 Bl. Com. 327.) The latter transmit an interest *already* created, while the former create estates. The language of our recording Acts, most obviously applies to deeds, instruments, &c., primarily creating estates, not derivative.

The registry acts of Pennsylvania are equally comprehensive as ours, indeed, more so ; for the first deed or conveyance is, by their statute, held *fraudulent* and void, unless, &c.; yet the courts of that State, holding to the true nature of a mortgage, declare that the assignment of it, is the assignment of a *chose in action*, and not strictly of an estate ; it is *not* within the registry acts, and derives no additional validity from being recorded. (Craft v. Webster, 4 Rawle's Rep. 242.*) What fortifies this conclusion, is, that the assignment of a mortgage is not within the statute of frauds, for it will pass by assignment of the debt. (Green v. Hart, 1 Johns. Rep. 580; Clearwater v. Rose, 1 Blackf. Rep. 137.) Hence, all subsequent purchasers are bound to take notice of the negotiable note and mortgage, especially as the same was negotiable in this case, and liable to be transferred to third persons. The assignment of the note is not required to be recorded. An assignment of the note, is so far an assignment of the mortgage, that the assignment of the latter, without the former, is a nullity, in *law and equity*. (Jackson v. Bronson, 19 Johns. Rep. 325.)

The $10,000 note being negotiable, that fact, in view of the appellees, was equivalent to an express stipulation in the mortgage, that it was given to secure the *payment* of the note, " *in whosesoever hands it might be found.*" Nothing can discharge it but *payment*, according to its own terms. If the purchasers

---

* See *contra*, Philips v. Bank of Lewistown, 18 Penn. St. Rep. 394.—Reps.

assume that the note is *paid*, or cannot be enforced, when it is not paid, they, (as in the case of Ware v. Bennett, 18 Tex. Rep. 794,) must take the risk; (Bolles v. Chauncey, 8 Conn. Rep. 389;) and in this view, it must be considered a conditional conveyance of title, which will give the note for purchase money priority over all others claiming the land; the condition must be performed, by payment to those really entitled. (Bear v. Whisler, 7 Watts's Rep. 144.)

The record of the mortgage is notice. If the vendors *misrepresented or misstated* that it was paid, when it was not, the purchasers are still bound. (Skeel v. Spraker, 8 Paige's Ch. Rep. 182.)

Though they who hold the note and mortgage, may have been ignorant, they take the land subject to the mortgage and note. (Maples v. Medlin, 1 Murph. N. C. Rep. 219.)

*Wall*, for appellees. I. A purchaser for a valuable consideration, without notice of a prior equitable right, obtaining the legal estate at the time of his purchase, is entitled to priority in equity as well as at law.

II. We join issue with the appellants upon the proposition asserted, that in this State, an assignment of a mortgage, though in writing, does not come within the meaning and scope of the registry acts. (Hart. Dig. Art. 2760, 2770, 2775, 2787.)

III. It is also contended, that Pilgrim and Stewart are not *bonâ fide* purchasers, because the purchase money has not been paid by them, or was not all paid, when they received notice of the plaintiff's claim.

It will be admitted, that if the purchase money, or any portion of it, is due to the mortgagee or the mortgagor, the purchasers would pay in their own wrong, if they paid any portion to their vendor, after notice of a prior outstanding equity; for they would be considered as trustees for the equitable claimants, and would retain their title, and resist the payment of the purchase money, to the extent of the equitable lien. But they would be without remedy, and might lose the land and

purchase money also. But when they incur such responsibility as to render them liable, at all events, for the payment, it has always been held sufficient. Hence the giving negotiable notes or securities, or transferring the notes of third persons, or settling the debts of the vendors, or even making valuable improvements, have been held sufficient, so far as completed before notice. (Frost v. Beekman, 1 Johns. Ch. Rep. 288; Jewett v. Palmer, 7 Id. 65; Freeman v. Dewey, 3 Sandf. Ch. Rep. 327; Boggs v. Varner, 6 Watts & S. Rep. 469.)

But the case is much stronger, where a party claims the protection of the registry acts of the country : in such case, it is only necessary that the consideration should be valuable; and it may be executory, or wholly or partially executed, as the purchaser relies on a statutory right, and not on a mere claim to equitable relief. (Jackson v. Winslow, 9 Cow. Rep. 13; Duphey v. Frenaye, 5 Stew. & Port. Rep. 215.)

The title, under the judgment of Burnham to Wm. Means, can well be relied on, upon the well established doctrine, that where the purchase is once made, and the character of a *bonâ fide* purchaser acquired, notice will not prevent the purchaser going forward, and protecting and securing what he has acquired. (Murray v. Finster, 2 Johns. Ch. Rep. 155; Wormley v. Wormley, 8 Wheat. Rep. 421; Boone v. Chiles, 10 Pet. Rep. 177; Vattier v. Hinde, 7 Id. 252.)

If there was any time or distinctness in the testimony of Nicholson, he did not say sufficient to fix notice upon the purchasers, as to the nature of the claim; the party to whom the indebtedness or mortgage was due; or from whom the amount; or anything to fix the attention of the purchasers; it was mere vague rumor picked up from a traveler, who had no authority or interest in the matter. But the testimony is conclusive, that if Nicholson had attempted to fix the time (which he has not,) at the period of the purchase, he was mistaken; the notice was not sufficient. (Kerns v. Swope, 2 Watts's Rep. 75; Epley v. Witherow, 7 Id. 163; Boggs v. Varner, 6 Watts & S. Rep.

469; Miller v. Cresson, 5 Id. 284; Hughson v. Mandeville, 4 Desau. Rep. 87.)

*Stewart*, also for appellees.

BELL, J.   This suit was instituted in the court below, by Henderson, Terry & Co., the appellants, against William Means, Ferdinand B. Means, Thomas J. Pilgrim, Thomas R. Stewart, Samuel Coxe, and another, who was merely a nominal party, and whom it is unnecessary to name.   The pleadings are very voluminous, and many points have been made and discussed by counsel before this court.   In order to present the main question in the case, the decision of which will dispose of the whole controversy, we will state the prominent and important facts disclosed by the record.

On the 14th day of April, 1856, William Means and his wife Frances Means, conveyed to Ferdinand B. Means a tract of land, on the south-west bank of the Guadalupe river, in Gonzales county, for the consideration, as recited in the deed, of seventeen thousand and five hundred dollars.   On the same day, (14th April, 1856,) Ferdinand B. Means executed to his vendor, William Means, two promissory notes for the purchase money of the land.   One of these notes was for ten thousand dollars, due twelve months after date; the other was for seven thousand five hundred dollars, due two years after date. On the same 14th day of April, 1856, Ferdinand B. Means executed a mortgage to William Means, on the land in question, to secure the payment of the two notes above named.   On the same day also, Ferdinand B. Means executed a deed of trust upon the land, to secure to William Means the payment of the said two notes.   In this deed of trust, one J. O. Wheeler was made the trustee.   The mortgage and the deed of trust were both recorded in Gonzales county, soon after their execution.   The note for ten thousand dollars, was used by William Means for the purpose of raising money in New Orleans.   The trustee in the deed of trust, J. O. Wheeler, endorsed the note,

together with the payee, William Means, and placed it in the hands of one Barella, as collateral security for a sum of money obtained from him by William Means. William Means paid his debt to Barella, and retired (as the mercantile phrase is) the note for ten thousand dollars. J. O. Wheeler's name was then erased from the back of the note; and on the 26th day of March, 1857, which was before the maturity of the note for ten thousand dollars, William Means became indebted to the appellants, Henderson, Terry & Co., and deposited with them the note for ten thousand dollars, and the mortgage executed by F. B. Means to secure it, "relinquishing to Henderson, "Terry & Co. all his (William Means's) right, title and interest, "as described in said mortgage, or so much of it as may be "found necessary to liquidate and satisfy the said note for ten "thousand dollars;" and "giving to Henderson, Terry & Co. "the same privileges that are allowed to me, (William Means,) "by the said mortgage, so far as the note for ten thousand "dollars is concerned." The whole agreement between William Means and Henderson, Terry & Co., was formally committed to writing; but Henderson, Terry & Co. did not cause it to be recorded in Gonzales county, nor did they give any notice to the mortgagor, Ferdinand B. Means, of the quasi assignment of the mortgage to them.

On the 1st day of April, 1858, which was nearly twelve months after the maturity of the note for ten thousand dollars, William Means and his wife, and Ferdinand B. Means and his wife, joined in a conveyance of the mortgaged premises, on the south-west bank of the Guadalupe river, in Gonzales county, to Thomas J. Pilgrim and Thomas R. Stewart, for the consideration of eight thousand dollars. On the 31st day of March, 1858, William Means executed a "release and discharge" of "a deed of trust, given by F. B. Means to me, "dated April 14th, 1856, recorded in book K, pages 504 and "505, one of the land record books of said county, in the "county clerk's office in and for the county of Gonzales, said "State, and given to secure the payment of two promissory

"notes, amounting to seventeen thousand and five hundred "dollars, the object and purpose of said deed of trust having "been accomplished; and the said notes having been paid off "and satisfied, I, the said William Means, do hereby pronounce "the said deed of trust null and void, and of no further effect "or virtue."

On the 1st day of April, 1858, which was the day of the sale by William Means and wife, and by Ferdinand B. Means and wife, to Pilgrim and Stewart, the trustee in the deed of trust, J. O. Wheeler, executed a release and discharge of the deed of trust, executed to him by F. B. Means, dated 14th April, 1856, recorded, &c. In the instrument, Wheeler stated that the deed of trust had accomplished its purposes, and that the two notes had been paid off and satisfied; and he pronounced the deed of trust null and void.

It was clearly proven by the county clerk, Chenault, that the instrument, recorded on pages 504 and 505 of book K of the records of his office, was in fact the mortgage of the 14th of April, 1856, from Ferdinand B. Means to William Means, and not a deed of trust, as recited in William Means's instrument of release.

Pilgrim and Stewart claimed to be purchasers in good faith, for a valuable consideration, without notice of the assignment of the note and mortgage to Henderson, Terry & Co., and there was no proof to show that they had any notice. On the contrary, the whole record, taken together, shows very clearly that they had no notice whatever of the secret assignment of the mortgage by William Means.

The testimony showed that Pilgrim and Stewart had paid a part of the purchase money of eight thousand dollars, in cash, and had become responsible to the judgment creditors of William Means, for the balance of the eight thousand dollars, in such manner that William Means was entirely released from responsibility for that amount.

Jones, presiding judge, charged the jury, that if Stewart and Pilgrim were purchasers, for a valuable consideration, without

notice of the claim of the plaintiffs, the plaintiffs could not recover as against them, and could not subject the land to the payment of their demand against William Means and F. B. Means.

The judge charged further, that the record of the mortgage, under which the plaintiffs claimed, would not affect the rights of Pilgrim and Stewart, unless they had notice, before they paid the purchase money, that the note for ten thousand dollars was in the hands of the plaintiffs, or was an outstanding claim against the land.

The judge also charged the jury, that if Pilgrim and Stewart had passed the whole amount of the purchase money to William Means's credit, in discharge of his previously existing debts, that would make Pilgrim and Stewart purchasers for a valuable consideration. The jury were instructed, that the plaintiffs were entitled to recover against William Means and Ferdinand B. Means, on the note for ten thousand dollars, to the extent of the indebtedness of William Means to the plaintiffs.

The jury found a verdict for the plaintiffs, against William Means and Ferdinand B. Means, for the amount of money claimed by plaintiffs, and returned their verdict for Stewart and Pilgrim, for the land which was sought to be made liable. Judgment was rendered in accordance with the verdict. The plaintiffs and Ferdinand B. Means moved for a new trial. The motions were overruled. The plaintiffs perfected their appeal. Ferdinand B. Means did not.

It will be perceived, from this statement of the case, that the main question presented for our consideration is, whether or not Henderson, Terry & Co. have any rights, by virtue of the assignment of the mortgage to them, which they can enforce against the mortgaged premises in the hands of Pilgrim and Stewart, who claim to be *bonâ fide* purchasers, for a valuable consideration, without notice.

We are of opinion that there was no error in the judgment of the court below. It is true, that very embarrassing questions have frequently been presented to the courts of this country

and of England, in reference to the rights of assignees of mortgages, and there is some apparent contrariety of decision on this subject. But a careful examination of the authorities, convinces us that the principle of the decisions is uniform. We have not been able to find any well considered case, where protection has been refused to one who has dealt in good faith with a mortgagee, without notice of a previous assignment, and where the purchaser from the mortgagee, has used proper diligence to inform himself of all the facts of the case.

In the cases of Matthews v. Wallwyn, and Williams v. Sorrell, reported in 4 Vesey Jr., it was settled by Lord Chancellor Loughborough, that the assignee of a mortgage, takes it subject to the account between the mortgagor and the mortgagee, and that payments made by the mortgagor to the mortgagee, without notice of the assignment by the mortgagor, must be allowed by the assignee. And in the case of Williams v. Sorrell, it was also held, that the registry of the assignment of the mortgage, was not such notice to the mortgagor, as would deprive him of the right to have payments allowed, that were made after the assignment. These cases have been followed, both in England and in the United States.

In the case of James v. Johnson, 6 Johns. Ch. Rep. 417, Chancellor Kent quotes, with approbation, the rule laid down in the case of Williams v. Sorrell. He says, that "it is an "obvious principle of equity, that all dealings with the mort- "gagee, even in his character of mortgagee, before notice of an "assignment, are valid." In the same case, the Chancellor said, "the abuse to which these clandestine assignments of "mortgages are subject, ought to impose upon persons who "traffic in such securities, the duty of making their assign- "ments, as soon as possible, matter of record. If they do "not, it is their own fault or negligence, and they ought to "suffer, rather than the subsequent purchaser, who is deceived "by appearances, and who has no notice or record to guide "him." It is true, that the Court of Errors of the State of New York, reversed the judgment of the Chancellor in the

above named case; but the reversal of his judgment cannot take away from his observations their intrinsic weight, and in fact can detract but little from the authority which his great name carries with it.

Not to consume time, by referring to other cases, we think it is the obvious policy of our registry laws, to require all instruments concerning lands to be recorded in the proper county. (Hart. Dig. Art. 2752, 2757, 2760, 2770, 2775, and 2787.) We are of opinion, that an assignment of a mortgage is "a lien affecting the title to land"—"a written contract in relation to land"—"an agreement"—"an instrument of writing of or concerning land," within the meaning of our registry laws, such as ought to be recorded, to make it effectual against subsequent purchasers, for a valuable consideration, without notice.

In the present case, it will be observed, that the purchasers, Pilgrim and Stewart, used all the means that prudence and caution could suggest, to inform themselves of the true state of the title which they were about to purchase. They found the mortgage of the 14th of April, 1856, to William Means, and the deed of trust of the same date to Wheeler, among the records of the country. They were informed by Wllliam Means, that the mortgage had no longer any vitality; that it had served the purposes of its execution, and was virtually dead. They took his solemn declaration in writing to that effect. They learned, also, from Wheeler, that the deed of trust was no longer of any force; that it, too, had performed its office; and they took Wheeler's declaration, in writing, to that effect. It will be observed, that these transactions took place. very nearly a year after the maturity of the note for ten thousand dollars, and when the note for seven thousand five hundred dollars was within a few days of its maturity. It will be observed, too, that nothing was said about the note for seven thousand five hundred dollars; and there can be but little doubt, that it was perfectly understood by all parties, at the time of Pilgrim and Stewart's purchase, that the whole trans-

action between William Means and Ferdinand B. Means and Wheeler, was a contrivance to enable William Means to procure money, by negotiating the note for ten thousand dollars.

Here the purchasers, Pilgrim and Stewart, looked to the records of the country. They found nothing there to inform them that any assignment had been made of the mortgage. They were dealing both with the mortgagor and the mortgagee, the party who held the legal estate, and the party in whom was the equity of redemption. As far as the records of the country, and the declarations of the mortgagee, could inform the purchasers, they were informed that they were purchasing both the legal and the equitable estate; and but for the secret assignment, there would have been united in the purchasers, both the legal and equitable estates, by virtue of the conveyance from both mortgagor and mortgagee.

There is no pretence that the purchasers had notice of the claim of the appellants, except that which is founded on the testimony of Nicholson, the clerk of the District Court. That witness was not able to say whether his conversation with Stewart, in which he mentioned the claim of Henderson, was before or after the purchase by Pilgrim and Stewart; and aside from this, the remark made by the witness, Nicholson, to Stewart, was not such as to give him any information of the fact that the mortgage had been assigned to Henderson. "The claim of some person in New Orleans," of which the witness, Nicholson, spoke, might very well be understood, by Stewart, to refer to the former deposit of the mortgage and note for ten thousand dollars, with Barella, a transaction about which Stewart was informed. We think it clear, from the record, that Pilgrim and Stewart had no notice whatever of the assignment to Henderson, Terry & Co. Had they, then, paid the purchase money, before they received notice of the assignment to Henderson, Terry & Co? The testimony shows that the payment of the whole purchase money was complete, to William Means, at the time of the execution of the deed from William Means and wife, and F. B. Means and wife, to Pilgrim

and Stewart. The purchasers, Pilgrim and Stewart, paid the judgment debts of William Means, to the amount of the whole of the purchase money, in such manner that the judgment creditors were satisfied, and William Means released from responsibility. This made Pilgrim and Stewart purchasers for value, just as much as if they had paid the purchase money in dollars and cents. The appellees, Pilgrim and Stewart, are found then to be what they claim to be in their pleadings, *bonâ fide* purchasers, for a valuable consideration, without notice. Their position is, perhaps, the most favorable one in which a defendant can stand in law. Their defence is, so to speak, the Gibraltar of defences—an impregnable fortress. Nor does their claim to protection rest upon any merely technical ground. It is founded in the strongest equity, and supported by the strongest considerations of public policy. It is contrary to sound policy, and to the spirit, if not the letter, of our registry laws, that secret assignments should be permitted to pass from hand to hand, and to operate as liens upon lands, to the disturbance of the honestly acquired titles of the country.

Another view of this subject is, that in reality, the appellants are obliged to invoke the aid of equity, to assert their claim under the assignment to them. Their right, under the assignment, is not a naked legal right, upon which they can insist, to the overthrow of equities in another. At law, a mortgage passes the legal estate; and but for the interposition of equity, the legal estate would become absolute in the mortgagee, upon the failure of the mortgagor to perform his obligation, according to the letter of his contract. Equity treats the mortgage as a mere security, however, and keeps alive the equity of redemption in the mortgagor, after his failure to perform. Now, it is only because equity treats the mortgage as a security, and as incidental to the debt, that the assignment of the debt carries with it the mortgage, as a continuing lien upon the land. It is in equity, that the assignment of the debt carries with it the lien upon the land, and is treated as conveying the legal estate to the assignee. At law, the legal estate could

only be passed by a deed; and the deed, to affect *bonâ fide* purchasers, without notice, would have to be recorded. The assignees of the mortgage, therefore, are driven to ask the aid of a court of equity, to enforce their lien upon the land; and in the present case, they are met by parties having equal equities. The appellants took the assignment of the mortgage, on the 26th March, 1857. The defendants, Pilgrim and Stewart, purchased on the 1st of April, 1858. More than a year elapsed, during which the assignees left it in the power of the mortgagee to practice a fraud upon others. We do not think that they can be heard to invoke the aid of a court of equity, to grant them relief against purchasers in good faith, without any knowledge of the assignment, and who have paid a valuable consideration.

The judgment of the court below is therefore affirmed.

Judgment affirmed.